**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | ) |
| **v.** | ) **Crim. Case No.: 12-cr-237 (RJL)** |
| | ) |
| **JAIME ANTONIO** | ) |
| **MANDUJANO-EUDAVE,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**EMERGENCY MOTION FOR PRETRIAL RELEASE TO**
**HOME DETENTION PURSUANT TO 18 U.S.C. § 3142**

Defendant, JAIME ANTONIO MANDUJANO-EUDAVE, by and through his counsel, Guadalupe Valencia, Henry E. Mazurek, and G. Allen Dale, respectfully moves this Court for emergency pretrial release to monitored home detention due to the COVID-19 pandemic.  This motion is made pursuant to  18 U.S.C. § 3142(c), or in the alternative, for temporary release for the duration of the COVID-19 crisis pursuant to 18 U.S.C. § 3142(i).

## I.      INTRODUCTION AND LEGAL STANDARD

The Bail Reform Act of 1984 requires pretrial release on a personal recognizance bond "unless the [Court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."  18 U.S.C. § 3142(b).  In making this determination, the Court should consider the following factors: "(1) the nature and circumstances of the offense charged . . .; (2) the weight of the evidence against the person;  (3) the history and characteristics of the person . . . (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  *Id.* at § 3142(g) (collectively, "the  § 3142(g) Factors").  Even if the Court finds that release on the

1

defendant's personal recognizance creates a risk of flight or a danger to the community, the law still favors pretrial release "subject to the least restrictive further condition, or combination of conditions, that [the Court] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(c)(1)(B).

While there is a presumption of detention (presumption of production, not persuasion) based on the charges against Mr. Mandujano, that burden of production is rebuttable, and is not heavy.  *See United States v. Lee*, 195 F.Supp.3d 120, 2016 WL 3659892, at *3 (D.D.C. 2016) ("the burden of production may not be heavy," but "the applicable cases all speak in terms of a defendant's obligation to introduce 'evidence.'")  Once the burden is satisfied with "some credible evidence contrary to the statutory presumption," *United States v. Addison*, 217 F. Supp. 3d 69, 73 (D.D.C. 2016) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985), the "presumption is incorporated into the other factors considered by this Court in determining whether to grant a conditional release . . . ." *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011); *accord United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985) ("the presumption" becomes "but one factor among many" for the Court to consider).

"That said, the burden of persuasion on the issue of detention remains, as always, with the government."  *Addison*, 217 F Supp 3d at 74.   The Government must demonstrate Mr. Mandujano's dangerousness by clear and convincing evidence and risk of flight by a preponderance of the evidence.  *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987) ( (holding that a finding that detention is required to prevent a defendant's flight "need only be supported by a preponderance of the evidence," while a finding that detention is required for the "safety of the community" requires "clear and convincing evidence").

When deciding an issue of pretrial release, "the court should bear in mind that it is only a

limited group of offenders who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987). Mr. Mandujano is simply not one of those offenders. After over five years of pretrial detention without incident, Mr. Mandujano contracted COVID-19 amid an outbreak at the Central Detention Facility ("CDF"). Because of his numerous pre-existing health conditions, including severe Type 2 diabetes with insulin dependence, and advanced coronary artery disease, COVID-19 is fatally dangerous for Mr. Mandujano. Indeed, he was hospitalized within a few days of his diagnosis and information from the United Medical Center ("UMC"), where he is currently housed, has been scarily sparse. His best chance for long-term recovery is release to home detention, where he can safely convalesce. Mr. Mandujano cannot medically afford to violate the strict conditions of release proposed, and risk returning to the CDF—where the unsanitary conditions have permitted a COVID-19 outbreak to proceed unchecked, and medical care is severely limited.

Although Mr. Mandujano is charged with serious crimes, he retains his presumption of innocence. *See* 18 U.S.C. § 3142(j). Given his frail health, Mr. Mandujano's remand could amount to a death sentence, without conviction on any charges! These extenuating circumstances, combined with the substantial and restrictive conditions of pretrial release proposed herein, provide a strong justification for granting bail.

## II.    PROPOSED PRETRIAL CONDITIONS OF RELEASE

We respectfully submit that the following conditions are sufficient to assure Mr. Mandujano's appearance during this case and ameliorate any risks his pretrial release may pose:

(1)    A $250,000 personal recognizance bond signed by Mr. Mandujano and two other financially responsible individuals;

(2)    Home detention under the supervision of a third-party custodian. Because Mr.

Mandujano is a Mexican national, was arrested abroad, and does not have a

residence in the United States, once the Court indicates an inclination to grant the

motion, Mr. Mandujano's family, including his proposed custodian, will complete

the necessary arrangements to secure an appropriate apartment for his home

detention while Mr. Mandujano recuperates in the hospital.  Indeed, the family

already is undertaking to obtain a lease on an apartment within the District that

would be suitable for Mr. Mandujano's confinement. Once secured, we will

provide the Court, the Government and Pretrial Services with details regarding the

residence for approval prior to Mr. Mandujano's discharge from the hospital;[1]

(3)  GPS monitoring in the High Intensity Supervision Program;

(4)  Strict Pretrial Services supervision, including daily reporting to Pretrial Services;

(5)  Travel outside of the home limited to medical visits that are pre-approved by

Pretrial Services, with at least 24 hours' notice to Pretrial Services prior to the visit

(except in the case of medical emergencies); and

(6)  Continued surrender of Mr. Mandujano's travel documents, an agreement not to

secure new travel documents, and a voluntary waiver of extradition (to the extent

requited by the Government).

This restrictive proposed bail package, which severely restricts Mr. Mandujano's liberty

---

[1]  We propose that Mr. Mandujaro's sister-in-law, Ms. Blanca Guadalupe Torres de Gutierrez serve as both bail suretor and third-party custodian.  She has lived in the United States for 30 years, is a U.S. citizen, and has two U.S. citizen children.  She also has been gainfully employed in the hospitality industry over the last 20 years.  Although she lives in Nevada, Ms. Torres de Gutierrez is willing to move temporarily to Washington D.C. to serve as Mr. Mandujano's custodian upon release.  Should the Court wish to hear argument on this motion, she will be available to participate in the hearing (via videoconference), and answer any questions to assure the Court that she is an appropriate and responsible person to act as bail suretor and custodian.

and permits almost instantaneous detection of any impermissible movements by him, is targeted to ameliorate the risk of flight and ensure the safety of the community. At the same time, it provides more humane and livable conditions of confinement to ensure that Mr. Mandujano can adequately protect and restore his health while awaiting disposition of this protracted litigation.

## III.   THE COURT SHOULD RELEASE MR. MANDUJANO TO PERMIT HIM TO RECOVER FROM COVID-19, WHICH HE CONTRACTED AT THE BADLY INFECTED CENTRAL DETENTION FACILITY

### A.   Mr. Mandujano is Critically Ill With COVID-19 and Faces a Potentially Lengthy Recovery Period

Mr. Mandujano is 58 years old.  He has been in persistently poor health since February 6, 2015, the date of his arrest.  He suffers from severe Type-2 diabetes for which he receives insulin injections on a daily basis.  He also has longstanding and advanced coronary artery disease.  Mr. Mandujano has suffered two heart attacks, which required placement of two stents, and quadruple bypass surgery prior to his arrest.  He continues to suffer from hypercholesterolemia (high cholesterol), and is treated with ten medications a day to mitigate the effects of his numerous health conditions.

Mr. Mandujano informed the government and the court of his severe health conditions during his initial appearance, as well as during subsequent court appearances.  *See* Feb 9, 2015 Tr. [Dkt 104] at 7:16-24 ("MR. VALENCIA: Mr. Mandujano takes nine different medications per day . . . and then he also takes insulin at night, for heart disease, high blood pressure, and a number of other ailments. THE COURT: Insulin because he's a diabetic? MR. VALENCIA: Yes, your Honor. THE COURT: Type 1? Type 2? MR. VALENCIA: Type 2 diabetic, type 2."); Nov. 22, 2016 Tr. [Dkt.112] at 28:20-23 ("MR. VALENCIA: Yes. He takes ten pills every single day. He's diabetic. He had open-heart surgery . . . every day is a struggle for him.").  His health has

continued to decline during his more than five years of incarceration in the United States (and almost one year in Spain).  He is now in real danger of acute and protracted illness due to the COVID-19 pandemic.

Although Mr. Mandujano had been spared in the first few months of the COVID-19 outbreak, during the weekend of May 16-17, 2020, Mr. Mandujano began showing symptoms of the virus.  He had a persistent low-grade fever, and subsequently tested positive for COVID-19. By Monday May 18, 2020, Mr. Mandujano's condition had deteriorated, and he was hospitalized at UMC Hospital in the District of Columbia, where he remains.  Although we were alerted to Mr. Mandujano's hospitalization by legal counsel at the CDF on Monday May 18, we have obtained few updates regarding his condition since, and those we have received are not promising.  Mr. Mandujano reports that he is being treated for complicating conditions of pneumonia in addition to COVID-19.  While he is not yet in the intensive care unit, he is being monitored hourly for evidence of deteriorating pulmonary function.

It is clear that Mr. Mandujano's combination of co-morbidities, including diabetes, high cholesterol and advanced coronary artery disease place him in the highest risk category for grave complications due to COVID-19.  *See* "Information for Healthcare Professionals: COVID-19 and Underlying Conditions," Centers for Disease Control and Prevention (listing "those at high-risk for severe illness from COVID-19," including people who have serious heart conditions, and people with diabetes).[2]  A study of COVID-19 victims in New York found that "just over 86% of reported COVID-19 deaths involved at least one co-morbidity." See "Comorbidities the rule in

---

[2] Available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fhcp%2Funderlying-conditions.html.

New York's COVID-19 deaths," The Hospitalist, (Apr. 8, 2020).[3]  And, Mr. Mandujano is under medical care for two of the top co-morbidities identified in COVID-19 deaths: diabetes, and coronary artery disease, found in 37.3%, and 12.4% of all COVID-19 deaths, respectively. *Id*.

The pre-existing health conditions that made Mr. Mandujano particularly susceptible to severe complications of COVID-19 are equally likely to impact the trajectory of his recovery. According to Dr. Mike Ryan, executive director of the World Health Organization's Health Emergencies Program, "People who suffer very severe illness can take months to recover from the illness." *See* Morgan McFall-Johnsen, "More than 1.3 million people have recovered from the coronavirus — and are likely now immune. But painful symptoms may last far longer than people realize," *Business Insider*, (May 8, 2020).[4]  Indeed, "[r]ecovery for hospitalized patients tends to look different, with much depending on a patient's health status prior to hospital admission." Yale University, "What does recovery from COVID-19 look like?" *MedicalXpress* (May 20, 2020).[5]  "Those least likely to recover seem to be frail older patients with other preexisting illnesses such as . . . heart disease."  Judith Graham, "What Does Recovery From COVID-19 Look Like? It Depends. A Pulmonologist Explains," *Kaiser Health News*, (Apr. 9, 2020).[6]  And, "[a]n estimated 30 to 40% of patients continue to face health challenges after being discharged from the hospital."  Yale University, "What does recovery from COVID-19 look like?"

---

[3] Available at: https://www.the - hospitalist.org/hospitalist/article/220457/coronavirusupdates/comorbidities-rule-new-yorks-covid-19-deaths.

[4] Available at: https://www.businessinsider.com/covid-19-recovery-survivors-immunity-2020-4.

[5] Available at: https://medicalxpress.com/news/2020-05-recovery-covid-.html.

[6] Available at: https://khn.org/news/what-does-recovery-from-covid-19-look-like-it-depends-a-pulmonologist-explains/.

*MedicalXpress*.  Long-lasting effects of COVID-19 can include "decreased lung capacity," and "lungs [with] signs of organ damage."  Morgan McFall-Johnsen, "More than 1.3 million people have recovered from the coronavirus — and are likely now immune. But painful symptoms may last far longer than people realize," *Business Insider*.  Because of his serious pre-existing health conditions Mr. Mandujano may face a halting and tenuous recovery.

### B.    The Conditions at the D.C. Central Detention Facility are Incompatible with his Full Recovery

Since his arrest, Mr. Mandujano has been detained in the Central Detention Facility ("CDF") in Washington D.C.  Should Mr. Mandujano be returned to CDF upon his discharge from UMC, the conditions at the jail could significantly impair his recovery, and prevent him from further protecting himself from COVID-19.

CDF has experienced a severe outbreak of COVID-19.  As of May 10, over two months into the COVID-19 outbreak in Washington D.C., COVID-19 continued to spread unmitigated in the facility: "Correction facilities in D.C. have found increasingly high numbers of cases, with both inmates and correctional officers contracting the virus . . . more and more cases have turned the D.C. jail into a potential coronavirus hot spot."  Kyley Schultz, "'Facing an unprecedented challenge,' New COVID-19 Cases at DC Central Detention Facility reflect growing concerns," *WUSA9*, (updated on May 10, 2020).[7]  Earlier this month, over 144 inmates and dozens of staff at CDF had tested positive for COVID-19, and 830 inmates were in quarantine—those numbers have doubtless grown since.  *Id.*

As is clear from the disease's unabated transmission through CDF, "COVID-19 poses a

---

[7]    Available    at:    https://www.wusa9.com/article/news/health/coronavirus/dc-department-of-corrections-inmates-coronavirus/65-bb595fc1-a3fb-450a-b0a9-3070a1f57e57.

unique and serious risk to inmates and workers in detention facilities," who are unable to take the same protective measures as the broader population.  *United States v. Harris*, No. CR 19-356, 2020 WL 1503444, at *2 (D.D.C. Mar. 27, 2020) (quotation marks and citations omitted).

Measures promoting "social distancing" have been implemented throughout the nation, with particularly stringent measures in place in Washington D.C., to slow the virus' spread.  On March 13, 2020, the White House declared a national emergency, under Section 319 of the Public Health Service Act, 42 U.S.C. § 247(d)).[8]  "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak," The White House (Mar. 13, 2020). On March 16, 2020, the White House issued guidance recommending that, for the next eight weeks, gatherings of ten persons or more be canceled or postponed.[9]  Sheri Fink, "White House Takes New Line After Dire Report on Death Toll," *New York Times* (Mar. 17, 2020).  On March 24, 2020, Mayor Muriel Bowser ordered that 100% of all non-essential workers to remain home, effectively shuttering Washington D.C.'s entire economy.[10]  The Mayor's "Stay at Home" order has been extended through at least June 8.[11]  These drastic measures followed the issuance of a report by British epidemiologists, concluding from emerging data that 2.2 million Americans could die without drastic intervention to slow the global spread of the deadly disease.  *See* Fink,

---

[8]  Available at:  https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[9]  Available at:  https://www.nytimes.com/2020/03/17/us/coronavirus-fatality-rate-white-house.html?action=click&module=Spotlight&pgtype=Homepage.

[10] Available at:  https://coronavirus.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Mayor%27s%20Order%202020-053%20Closure%20of%20Non-Essential%20Businesses%20and%20Prohibiti....pdf.

[11] Available at:  https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/attachments/Mayors-Order-2020-066-Extensions-of-Public-Emergency-and-Public-Health.pdf.

"White House Takes New Line After Dire Report on Death Toll," *New York Times*.

Similar "social distancing" protections are, however, impossible at the CDF, which is plagued by "overcrowding, population density in close confinement, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment such as masks and gloves in some facilities." *Harris*, No. CR 19-356, 2020 WL 1503444, at *2 (quotation marks and citations omitted). "6-foot distancing and proper decontamination of surfaces is virtually impossible." *Id.* (quotation marks and citations omitted); *accord United States v. Johnson*, No. 15-CR-125 (KBJ), 2020 WL 2515856, at *9 (D.D.C. May 16, 2020) ("'social distancing,' frequent (and thorough) hand washing, and avoidance of close contact with others (in increasingly more restrictive terms) . . . are extremely difficult to implement in a detention facility.") (quotation marks and citations omitted). "Additionally, the high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure." *Id.* (quotation marks and citations omitted).

These conditions at the jail facilities in Washington D.C., including CDF, have led to predictably disastrous results: "the infection rate in DOC facilities was over seven times the infection rate of the District of Columbia at large." *Banks v. Booth*, No. CV 20-849(CKK), 2020 WL 1914896, at *6 (D.D.C. Apr. 19, 2020). Still, the jail has implemented insufficient measures to protect inmates and staff. The court in *Banks*, which addressed inmates' constitutional challenges to their conditions of detention at CDF amidst the COVID-19 pandemic, found that "social distancing was slow to be instituted and has not been fully operationalized in . . . CDF." *Id.* at *7. Inmates and staff alike reported that "[s]ocial distancing is not happening" in the facility, and that even several weeks after Mayor Bowser issued his initial "Stay at Home" order,

the CDF was "still allowing 40 inmates to congregate in the recreation yard."  *Id.*  Implementation of COVID-19 screening protocols have likewise been slapdash at best.  For example, while "all visitors and staff have their temperatures checked with a non-contact infrared thermometer," recorded temperatures are frequently "inaccurate, registering in the low 90 degrees."  *Id.*[12]

Perhaps most concerning for the prospects of Mr. Mandujano's recovery, the court in *Banks* found that in the midst of this public health crisis, CDF staff "are slow to respond to those inmates who display symptoms of COVID-19," and "inmates who have requested medical aid for COVID-19 symptoms report long waits for medical care, testing, or separation from the general population."  *Banks*, No. CV 20-849(CKK), 2020 WL 1914896, at *10.  Recent public reporting confirms that there continue to be "days long delays in inmates receiving medical care."  *See* Schultz, "'Facing an unprecedented challenge,'" *WUSA9*.  The inadequate public health measures at CDF already have jeopardized Mr. Mandujano's health.  Now that he has contracted COVID-19, the Court should prevent the conditions at CDF from taking a further debilitating toll on his physical health.  The Court should grant his motion for release on the proposed strict conditions.

**C.   Given Mr. Mandujano's Medical Circumstances, the Proposed Bail Package Ameliorates Any Flight Risk or Danger to Other Persons or Community**

Under the Bail Reform Act, the Court should release Mr. Mandujano if there is some "combination of conditions" that "will reasonably assure the appearance of the person as required and the safety of any other person and the community."  *See* 18 U.S.C. § 3142(c).  The restrictive conditions that Mr. Mandujano proposes plainly meet that standard—particularly given Mr.

---

[12]   It remains medically uncertain whether a patient can contract COVID-19 more than once, and to what extent relapse is possible.  Accordingly, Mr. Mandujano may remain vulnerable to further infection should he be returned to CDF.  *See, e.g., Se Eun Gong*, "In South Korea, A Growing Number Of COVID-19 Patients Test Positive After Recovery," *NPR* (Apr. 17, 2020), available at: https://www.npr.org/sections/coronavirus-live-updates/2020/04/17/836767242/in-south-korea-a-growing-number-of-covid-19-patients-test-positive-after-recover.

Mandujano's feeble health, and his uncertain prospects for recovering from COVID-19. Specifically, after over five years of pretrial detention, Mr. Mandujano faces a dire risk to his health, proximately caused by his conditions of detention.  Because he was unable to practice adequate social distancing and personal hygiene, he contracted COVID-19 amid the outbreak at CDF.  He remains hospitalized, and is in mortal danger from the virus due to his pre-existing health conditions, including Type-2 diabetes and heart disease.  His recovery prospects are uncertain.  Mr. Mandujano's life would be in continuous peril should he be returned to CDF where unsanitary conditions and inadequate medical care have permitted a raging COVID-19 outbreak to remain unchecked.

Mr. Mandujano has every reason to perfectly comply with his conditions of release to avoid these gratuitous risks to his life.  The Court should, therefore, release Mr. Mandujano to home detention under the stringent conditions proposed.

Nor does Mr. Mandujano's release present clear and convincing danger to the community. "A comprehensive view of the danger the Defendant poses to the community requires considering all factors," including those posed by the COVID-19 pandemic.  *United States v. Stephens*, No. 15-cr-95 (AJN), [Dkt. 2798] at 2 (Mar. 19, 2020 S.D.N.Y.) (granting bail based, in part, on the risk that COVID-19 poses to detainees at a New York City jail with a COVID-19 outbreak).  The halting physical recovery that Mr. Mandujano will likely experience should he be returned to the CDF upon his discharge from the hospital could have deleterious effects on the jail population more broadly—including requiring constant medical attention, thereby draining scarce medical resources necessary to care for hundreds of inmates during the COVID-19 crisis.  His return to CDF itself represents a danger to the community, and a countervailing consideration favoring release.  *See, e.g., Banks*, No. CV 20-849(CKK), 2020 WL 1914896, at *12 (lowering the risk of

infection in detainees at DOC jails "also benefits the public" as "if [inmates] contract COVID-19 and experience complications, they will be transported to community hospitals—thereby using scarce community resources (ER beds, general hospital beds, ICU beds).") (quotation marks and citations omitted).

Recognizing the exceptional and unprecedented nature of the COVID-19 public health crisis, courts in this district, and throughout the country, have continued to release defendants on bail in serious cases, including in cases involving a presumption of detention. *See, e.g., United States v. Dabney*, No. 20-CR-27 (KBJ), 2020 WL 1867750, at *2 (D.D.C. Apr. 13, 2020) (in presumption case releasing defendant with "an underlying medical condition that could heighten a defendant's risk of harm during the period of pretrial detention," explaining that the danger to the defendant was "material" to the court's "detention determination"); *United States v. Harris*, No. CR 19-356, 2020 WL 1503444, at *1 (D.D.C. Mar. 27, 2020) (holding that the dangers posed by COVID-19 to the defendant constituted "exceptional reasons" under § 3145's exacting standard, although the defendant had pled guilty to child pornography distribution, which "qualifies as a crime of violence," and requires the defendant's mandatory detention under 18 U.S.C. § 3143(a)(2)); *United States v. Eli*, 20 Cr. 50 (RJD) (RER) (E.D.N.Y. Mar. 24, 2020) (releasing, over government's objection, defendant charged with multiple robberies involving guns and drugs, because of COVID risk); *United States v. Baker*, 20 Cr. 125 (KMK) (S.D.N.Y. Mar. 24, 2020) (releasing defendant charged with conspiracy and possession with intent to distribute controlled narcotics substances); *see also United States v. Johnson*, No. 15-CR-125 (KBJ), 2020 WL 2515856, at *10 (D.D.C. May 16, 2020) (granting compassionate release to a defendant who was "taking multiple prescribed medications for his heart condition," and thus faced severe "risks posed by COVID-19," although defendant had been convicted of multiple counts of unlawful

possession of an unregistered firearm, unlawful making of a firearm, and possession of a weapon of mass destruction); *United States v. Curtis*, No. CR 03-533 (BAH), 2020 WL 1935543, at *1 (D.D.C. Apr. 22, 2020) (granting compassionate release due to the COVID-19 crisis to a defendant convicted of "offenses arising out of a sex-trafficking operation involving minors," who was "sentenced to six concurrent terms of life imprisonment").

Mr. Mandujano's serious health conditions, which increase his vulnerability to catastrophic health consequences due to COVID-19 also increase his incentive to abide by his restrictive bail conditions.  He has every impetus to protect his physical well-being during any period of pretrial release, and can do so only by scrupulously heeding his bail conditions of release, and avoiding remand to the CDF.  The risks of a bail violation are simply too great for Mr. Mandujano.  His illness thus inherently diminishes any risk of flight or danger to the community that he may pose.  *See United States v. Thomas*, No. CR 17-194 (RDM), 2020 WL 1911558, at *6 (D.D.C. Apr. 20, 2020) (the defendant's susceptibility to COVID-19 "is also relevant to the nature and seriousness of the danger to the community that would be posed by Thomas's release. As someone at high risk if infected with the virus, Thomas has a compelling reason to stay home, and that incentive is compounded by that fact that, if he violates his release, he risks returning to the D.C. Jail.") (quotation marks and citations omitted); *United States v. Mclean*, No. 19-cr-380 (RDM) [Dkt. 21] at *3-4 (D.D.C. March 28, 2020) ("By violating the terms of that condition, Defendant would face two distinct risks—the risk that he would be sent back to the D.C. jail, where he might be unable to distance himself from others in the manner urged by the CDC, and the risk that he would come into contact with someone while outside his home, who could infect him.").

These same factors plainly rebut the presumption of detention applicable here.  *See*

14

*Thomas*, No. CR 17-194 (RDM), 2020 WL 1911558, at *5 ("The Court concludes, however, that Thomas has now come forward with sufficient evidence to meet his burden of production, overcoming . . . the presumption in favor of detention. Most importantly . . . he presents a heightened risk if exposed to the escalating number of detainees infected with COVID-19 at the D.C. Jail. This evidence . . . reduces the likelihood that, if released to home confinement, Thomas will pose a danger to the community.").

Likewise, the law does not require absolute certainty to release Mr. Mandujano: only conditions sufficient to "*reasonably assure* the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). *See United States v. Madoff*, 586 F. Supp. 2d 240, at 249 (S.D.N.Y. Jan. 12, 2009) ("The [Bail Reform] Act does not require that the risk be zero, but that conditions imposed 'reasonably assure' appearance."). The proposed conditions more than meet that standard: Mr. Mandujano's liberty will be severely restricted, and because he will be monitored in at least three ways—by his custodian, GPS, and daily calls to Pretrial Services—any attempt to evade his bail conditions will be swiftly detected.

The dangers to Mr. Mandujano and the community posed by his potential relapse and prolonged recovery should he return to the CDF tip the balance in favor of his release. *See, e.g., Johnson*, No. 15-CR-125 (KBJ), 2020 WL 2515856, at *9 ("[T]he extremely serious health risks that [COVID-19] presents," are thus "especially" serious for "those individuals who are unfortunately presently detained in federal custody.") (quotation marks and citations omitted); Standing Order in Criminal Proceedings Before Judge Keith P. Ellison During Pendency of National Emergency (S.D. Texas Mar. 17, 2020) (Noting, inter alia, that one of the bail factors "is the person's 'physical and mental condition' and that the "conditions that have resulted in the

presidential declaration of a National Emergency constitute[s] material information . . . .").

**D.    In the Alternative, the Court Should Temporarily Release Mr. Mandujano for the Duration of the Covid-19 Pandemic, and his Recovery**

In the alternative, the Court should temporarily release Mr. Mandujano pursuant to 18 U.S.C. § 3142(i) until he fully recovers, and the COVID-19 crisis abates.  18 U.S.C. § 3142(i) provides that where a detention order has been issued, "a judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."

The severe health risks that Mr. Mandujano faces as he recovers from COVID-19, and the disproportionate medical attention he would likely require—potentially burdening the jail's already limited resources—are "compelling reasons" warranting his temporary release.  For precisely these reasons, several courts have granted temporary release during this pandemic to defendants accused of serious crimes involving narcotics and violence.  *See United States v. Davis*, No. 19-cr-292 (JDB) [Dkt. 157] at *5 (D.C.C. Apr. 6, 2020) (granting the defendant temporary release in a presumption case: "If Davis contracts the virus while suffering from acute bronchitis, he will likely require significant medical resources and attention, and even if he does not contract the virus, he is at minimum another inmate requiring medical treatment for respiratory problems at the D.C. Jail . . . decreasing the number of people in the D.C. Jail and lessening the burden on the jail's limited healthcare resources will be crucial to protecting all inmates and staff at the D.C. Jail as well as people in the surrounding community."); *Thomas*, CR 17-194 (RDM), 2020 WL 1911558, at *8 (granting temporary release under § 3142(i) because "[i]f Thomas is infected at the jail, moreover, he will likely require significant medical resources and attention, burdening  . . . the jail's limited

healthcare resources.") (quotation marks and citations omitted); *see also United States v. Dhavale*, No. 19-MJ-00092, 2020 WL 1935544, at *1, *6 (D.D.C. Apr. 21, 2020) (granting temporary release in a presumption case where the defendant was accused of crossing interstate lines to "to engage in sexual relations with a purported 13-year-old girl," "[d]ue to [the defendant's] underlying medical conditions and the current conditions at DOC facilities, defendant has provided a compelling reason for his temporary release, pursuant to § 3142(i)"); *United States v. Casper*, No. 20-cr-0061 (APM) [Dkt. 15] (April 9, 2020 D.D.C.) (releasing defendant, over objection of the government, pending sentencing after a plea to mail fraud even though he was re-arrested while on release and charged with wire fraud relating to his operation of a fraudulent website purporting to sell COVID-19 supplies); *United States v. Hudson*, 19-cr-496 (CM), [Dkt. 72] at 8 (Mar. 23, 2020 S.D.N.Y.) (temporarily releasing, over government objection, defendant charged with narcotics conspiracy, loansharking, and extortion, whose bail application was twice denied due to the danger he posed to the community based on the violent nature of the charges, due to the Covid-19 crisis and the ensuing difficulty of his attorneys in meeting defendant in preparation for his approaching trial); *United States v. Vizzari*, No. 19-cr-767 (VSB) [Dkt. 21] (Mar. 20, 2020 S.D.N.Y.) (temporarily releasing defendant awaiting sentencing after pleading guilty to possession with intent to distribute heroin and violation of parole in a prior conviction for possession with intent to distribute heroin based on COVID-19 health crisis); *United States v. Perez*, 19-cr-297 (PAE) [Dkt. 62] at 1 (Mar. 19, 2020 S.D.N.Y.) (temporarily releasing defendant charged with attempted inducement of a minor to engage in illegal sexual conduct "conclude[ing] that compelling reasons exist for temporary release of the defendant from custody during the current public health crisis" over government's objections that he had previously committed crimes while on pre-trial release and parole, and posed a severe flight risk as demonstrated by his detention for bail jumping in the

instant matter as well as eight prior arrests for failure to appear).

Mr. Mandujano's sister-in-law, Ms. Torres de Gutierrez, is also an "appropriate person" to serve as his third-party custodian under § 3142(i).  She is a U.S. citizen, with longstanding residence, 27 years of gainful employment in the Las Vegas hospitality industry, and two U.S. Citizen children.  She also has offered to take leave from work (she currently is not reporting to work because of COVID-19 restrictions) to live with Mr. Mandujano in Washington D.C. during pendency of his case, so she would be home with him the vast majority of the time to oversee his detention.  *See Thomas*, No. CR 17-194 (RDM), 2020 WL 1911558, at *8 ("The Court also finds that Thomas's sister is an 'appropriate person' to take custody of Thomas if released, where the defendant's sister was gainfully employed, but presently not working due to the COVID-19 pandemic); *United States v. Stephens*, No. 15-cr-95, 2020 WL 1295155, at *7 (S.D.N.Y. Mar. 19, 2020) (The "case law suggests that family members may constitute 'appropriate persons' where the defendant is released to relatives and placed under house arrest.").

To the extent the Court is disinclined to grant Mr. Mandujano bail pursuant to § 3142(c), it should temporarily release him under the proposed conditions to the custody of Ms. Torres de Gutierrez for the duration of his recovery, and until the COVID-19 crisis subsides.

E.    **Mr. Mandujano Should not be Subject to Immigration Detainers Upon his Release**

The Court should further clarify that Mr. Mandujano should not be subject to any detainer by U.S. Immigration and Customs Enforcement ("ICE") upon his release on bail.  *See, e.g., United States v. Millul*, No. 18-cr-579, [Dkt. 200] (S.D.N.Y. May 19, 2020) (granting compassionate release, and "clarify[ing]" that the defendant "is ordered released on May 21, 2020, not subject to any detainer by U.S. Immigration and Customs Enforcement").  Such an order would, in any event,

be in line with ICE's stated policies to "minimize spread of the virus," including "release[ing] detainees at a higher risk of suffering serious complications from COVID-19 and . . . also limiting the intake of new detainees." *United States v. Suazo Nunez*, No. 20 MAG 1734, 2020 WL 1911226, at *2 (S.D.N.Y. Apr. 20, 2020) (citing *ICE Guidance on COVID-19*, ICE.gov, https://www.ice.gov/coronavirus).

## **CONCLUSION**

Because of Mr. Mandujano's fragile health, and his tenuous and uncertain recovery from COVID-19, the Court should grant Mr. Mandujano bail, or in the alternative, release him temporarily into home detention on the proposed conditions for the duration of his recovery period and the COVID-19 crisis. 18 U.S.C. § 3142(c) and (i).

Dated: May 22, 2020

Respectfully submitted,

MEISTER SEELIG & FEIN LLP
By: */s/ Henry Edward Mazurek*
HENRY EDWARD MAZUREK
Admitted *pro hac vice*
New York Bar No. 2636520 125
Park Avenue, Suite 700 New York,
NY 10017
T: (212) 655-3500
hem@msf-law.com

LAW OFFICE OF G. ALLEN DALE, PLLC
By: */s/ G. Allen Dale*
G. ALLEN DALE
District of Columbia Bar No. 954537
901 New York Avenue, NW Suite 500 West
Washington, DC 20001
T: 202-638-2900
gallendale@aol.com

LAW OFFICE OF
GUADALUPE VALENCIA
By: */s/ Guadalupe Valencia*
GUADALUPE VALENCIA
Admitted *pro hac vice* California
State Bar No. 197831 105 West F
Street, Third Floor San Diego, CA
92101
T: (619) 232-2588
gvalencialaw@yahoo.com

*Counsel for Jaime Antonio Mandujano-Eudave*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 22, 2020 a copy of Defendant Jaime Antonio Mandujano-Eudave's Emergency Motion for Pretrial Release to Home Detention Pursuant to 18 U.S.C. § 3142, and Memorandum of Law in support thereof was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: May 22, 2020

MEISTER SEELIG & FEIN LLP
By: */s/ Henry Edward Mazurek*
HENRY EDWARD MAZUREK
Admitted *pro hac vice*
New York Bar No. 2636520 125
Park Avenue, Suite 700 New York,
NY 10017
T: (212) 655-3500
hem@msf-law.com

*Counsel for Jaime Mandujano-Eudave*