**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| v. | ) **CRIMINAL NO.: 12-CR-237 (RJL)** |
| | ) |
| **JAIME MANDUJANO-EUDAVE** | ) |
| | ) |
| **Defendant.** | ) |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**EMERGENCY MOTION FOR RELEASE**

The United States of America, by and through its undersigned attorneys, respectfully submits this opposition to defendant's Emergency Motion for Pre-Trial Release to Home Detention Pursuant to 18 USC 3142 (ECF No. 137) (hereinafter, "Defense Motion"). In the Defense Motion, the defendant argues for release because he has contracted COVID-19. Because the defendant remains a flight risk and a danger to the community, and because the D.C. Department of Corrections has and continues to provide him with prompt, in-patient medical care, the government submits that the motion should be denied. In support, the government relies on the following factual and legal authority, as well as any that may be offered at a hearing on these motions.

**PROCEDURAL HISTORY**

On November 2, 2012, the Defendant was indicted by a Grand Jury in the District of Columbia for violations of 21 U.S.C. §§ 959, 960, 963 for Conspiracy to Distribute Five Kilograms or More of Cocaine, Fifty Grams or More of Methamphetamine, and One Thousand Kilograms or More of Marijuana for Importation into the United States.

1

On August 31, 2014, the defendant, a citizen of Mexico, was arrested in Spain on a provisional arrest warrant based on the November 2012 indictment in this case. Following his arrest, the defendant waived extradition, which resulted in his extradition to the United States on February 6, 2015, and his initial appearance on February 9, 2015 in D.C. District Court.

On September 16, 2016, after the breakdown of extensive plea negotiations, the defendant made a request to proceed to trial. The Court set a trial date of January 23, 2017, with pre-trial motions due on October 31, 2016. During the status conference, the Government, ex parte, informed the Court of the status of the other under seal defendants and informed the Court that the Government would file a motion requesting that the Court deem the case complex. Since that time, the case has been pending motions, delayed by the status of co-defendants, and/or awaiting the return of mutual legal assistance treaty requests for evidence.

On May 22, 2020, the defendant filed the instant motion asking for pretrial release pursuant to 18 U.S.C. § 3142(c), or in the alternative, for temporary release for the duration of the COVID-19 crisis pursuant to 18 U.S.C. § 3142(i).

## ARGUMENT

The defendant's motion for release rests on the following argument: that because he has contracted COVID-19, he is no longer dangerous or a flight risk, and that incarcerating him would burden his recovery and the jail system.

A defendant must be detained pending trial if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A court may reconsider its decision regarding pretrial detention "at any time before trial if the judicial officer finds that

information exists that was not known to the movant at the time and that has a material bearing on the issue" of whether there exist conditions for release that would "reasonably assure the appearance of such person as required." *United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C. 2014) (citing 18 U.S.C. § 3142(f)(2)(B); accord *United States v. Moore*, No. 13–330, 2014 WL 1273439, at *1 (D.D.C. Mar. 31, 2014)). [1]

The defendant is charged with drug trafficking offenses that carry a presumption that no condition or combination of conditions will sufficiently guarantee the defendant's presence in court and protect the safety of the community. Further, the Defendant faces significant jail time, including a mandatory minimum sentence of ten years. He potentially has access to substantial amounts of drug proceeds in the form of untraceable cash. He has no immigration status in the United States and is subject to an immigration detainer. Accordingly, the Defendant presents a serious risk of flight and danger to the community that cannot be mitigated by any condition or combination of conditions and should be detained pending trial. Nothing about the defendant

---

[1] Although the Defense does not argue it, the Government notes that 18 U.S.C. § 3145(c) provides that a person may be released, under specific circumstances, if it is "clearly shown that there are exceptional reasons why such's detention would not be appropriate." Some courts are divided on whether 18 U.S.C. § 3145(c) also applies as a safety valve in this circumstance or is only applicable to the courts of appeal on appeal, and the D.C. Circuit has not opined on the issue. *See United States v. Briggs*, 577 F. Supp. 2d 435, 436 (D.D.C. 2008) (discussing lack of opinion from the D.C. Circuit). The majority of district courts that have addressed the issue appear to have found that 3145(c) *does* apply in the present circumstance. Assuming *arguendo* that district courts have authority to utilize Section 3145(c), it provides that a defendant subject to detention under Section 3142(a)(2) may nonetheless be released if the defendant 1) shows by *clear and convincing* evidence that he is not a flight risk or a danger to any other person or the community *and* 2) "if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C. Section 3145(c) (emphasis added). Because the defendant does not argue for release under this provision, the Government merely provides this information for the Court's edification.

having contracted COVID-19 has altered that dynamic, and thus pre-trial detention remains appropriate.

In order to fully appreciate the government's position, the government will review the detention factors under the Bail Reform Act, as well as whether the information provided by the defendant separately impacts the original detention analysis.

## I.     The Bail Reform Act factors remain in favor of detention.

The Bail Reform Act requires the judicial officer to assess various factors, as described below, before releasing or detaining a defendant. 18 U.S.C. § 3142(g). The determination that a criminal defendant must be detained pursuant to subsection (g) "may be reopened" at any time prior to trial if new information surfaces that has a material bearing on the potential conditions of release that may reasonably assure the defendant's appearance in court and the safety of the community. 18 U.S.C. § 3142(f). Section 3142(i) also provides a distinct mechanism for temporarily releasing a detained defendant, in a manner that does not revisit the initial bond determination, but rather if a court finds that such release is "necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Before turning to the defendant's claim that contracting COVID-19 is a basis to authorize release, we first assess the §3142(g) factors as they apply to this case, bearing in mind that the defendant is charged with a Controlled Substances Act offense with a statutory maximum of 10 years or more, and thus there is a rebuttable presumption that no conditions will assure as to both flight risk and danger. 18 U.S.C. § 3142(e)(3)(A); *United States v. Smith*, 79 F.3d 1208 (D.C. Cir. 1996) (indictment charging qualifying offense sufficient to trigger presumption). When the presumption is triggered, it operates "at a minimum to impose a burden of production on the defendant to offer some credible

evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). However, the presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption remains as an evidentiary finding militating against release and to be weighed along with all the evidence relating to the factors listed in § 3142(g). *See United States v. Cherry*, 221 F. Supp. 3d 26, 32 (D.D.C. 2016) (citing *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011) and *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)). In other words, "it does not follow that the effect of the presumption disappears as soon as the defendant produced some contrary evidence. Congress framed the flight presumption in light of its general finding, based on extensive testimony, that flight to avoid prosecution is particularly high among those charged with major drug offenses." *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1985); *see also Cherry*, 221 F. Supp. 3d at 32; *Ali*, 793 F. Supp. 2d at 391. For all of the reasons addressed below, the defendant will be unable to satisfy his burden to rebut the presumption that no condition or combination of conditions will reasonably assure the appearance of the Defendant and the safety of the community.

### a. Nature and Circumstances of the Offense

The defendant is alleged to have been a member of a highly prolific drug trafficking organization ("DTO") that transported cocaine from South America into Mexico for importation into the United States. The defendant's role was to coordinate the DTO's boat operations on the Pacific Ocean. The defendant and his co-conspirators would arrange to meet a vessel that had departed from Colombia at GPS coordinates in the Pacific Ocean. They would then transfer the cocaine to one of the defendant's boats, which would import the cocaine into Mexico. The defendant and his co-conspirators were responsible for the transport of numerous multi-thousand

kilogram loads of cocaine over the last decade in this manner, as well as for the cultivation and distribution of multi-ton shipments of marijuana and the distribution of tons of ephedrine for the production of methamphetamine. The investigation revealed that these drugs were primarily, if not wholly, destined for the United States for distribution. Furthermore, the investigation revealed that the DTO for which the defendant worked was aligned with the Sinaloa Cartel, one of the most powerful criminal organizations in the world.

### b.  Weight of the Evidence

The government intends to call numerous cooperating witnesses and confidential sources who can testify to the defendant's involvement in the charged conspiracy. Some of these individuals worked directly with the defendant; others learned of the defendant's role through coconspirator statements. These individuals are corroborated by ledgers wherein the defendant is referenced by his alias, as well as multiples seizures of narcotics, including one seizure of 560 kilograms of cocaine conducted by the U.S. Coast Guard. In short, the evidence of guilt is overwhelming.

### c.  History and Characteristics

The defendant's prior history and characteristics establish his risk of flight in this case. A determination of risk of flight must be supported only by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). Here, there is a significant risk of flight in this case due to the potential sentence the defendant faces, as well as his lack of ties to this District and minimal ties to the United States.

The possibility of a severe sentence is an important factor in assessing a defendant's incentive to flee. *See United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 (D.D.C. 2013) (holding

the nature and circumstances of the offenses charged against defendant strongly favor detention because of the substantial incentive to flee the United States); *United States v. Anderson*, 384 F.Supp.2d 32, 36 (D.D.C. 2005) (holding the gravity of the offenses and the potential prison term create a considerable incentive for the defendant to avoid prosecution and the likelihood of imprisonment in the event of a conviction); *see also United States v. Ali*, 793 F. Supp. 2d at 392. As discussed above, the Defendant faces a mandatory minimum sentence of 10 years—and up to life imprisonment—if convicted on the count charged in the Indictment.

Federal courts have repeatedly recognized that "[f]light to avoid prosecution is particularly high among persons charged with major drug offenses," because "drug traffickers often have established ties outside the United States . . . [and] have both the resources and foreign contacts to escape to other countries." *See, e.g., United States v. Alatishe*, 768 F.2d 364, 370 n.13 (D.C. Cir. 1985) (citing S. Rep. No. 98-225 at 20 (1983), reprinted in 1984 U.S.C C.A.N. 1, 23). This is nowhere more evident than in the type of transnational organized crime in which the Defendant has engaged. Organized transnational drug conspiracies often span multiple countries and have the potential to generate millions of dollars in gross proceeds from the sale of potent controlled substances. Indeed, "Congress made 'risk of flight' a grounds for detention because it believed that there were major drug dealers to whom the posting and losing of even large amounts of money bond were not a deterrent, but a mere cost of doing business." *United States v. Battle*, 59 F.Supp.2d 17, 19 (D.D.C. 1999).

Additionally, the defendant is a Mexican citizen, arrested while traveling in Spain, who has no immigration status in the United States. If released on bond, the defendant would be subject to arrest and detention by Immigration and Customs Officials. *See* 8 U.S.C. 1357

(authorizing I.C.E. to make warrantless arrests as appropriate or to obtain warrants for immigration offenses); Attachment A (Defendant's Immigration Detainer).

Thus, there is a serious risk that the defendant would attempt to leave the United States if given the opportunity. He has few, if any, lawful contacts in this federal district or to the United States and thus, no reason to remain in this country. Furthermore, the defendant has no known assets, no employment, no property, and no immediate family here (although apparently a sister-in-law in Nevada), but is believed to still have substantial assets and ties to Mexico. The defendant has been brought here under the authority of this Court solely for the purpose of federal prosecution. In short, the defendant has no reason to remain in this country other than this criminal case, and he therefore represents an overwhelming risk of flight if released from custody.

In sum, the defendant has the means, motive, and opportunity to flee the country and should be detained without bail. *See Hong Vo*, 978 F. Supp. 2d at 43 (finding detention warranted because not only was defendant indicted on serious charges carrying a severe punishment potential, but defendant had ability to flee the United States); *see also United States v. Anderson*, 384 F. Supp. 2d 32, 36 (D.D.C. 2005) (finding detention warranted because not only did the defendant have the ability to flee D.C. and the United States, but also had the ability to live comfortably in foreign jurisdiction and evade capture due to his substantial assets abroad).

### d.  Danger to the Community

A determination of dangerousness to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f). Federal courts have recognized that drug traffickers, particularly those in positions of authority, are likely to continue engaging in drug related activities if released on bail and thus constitute a danger to the community. *See, e.g., Alatishe*,

768 F.2d at 370 n.13 (citing S. Rep. No. 98-225 at 20 (1983), reprinted in 1984 U.S.C C.A.N. 1, 23); *accord United States v. Creekmore*, 1997 W.L. 732435 (D.D.C. 1997) (Facciola, J.). The defendant allegedly participated in an international drug transportation and distribution organization which imported cocaine, a dangerous controlled substance, into the United States for distribution to the United States public at large. If he were released and continued in this conduct, he would pose a significant risk to the safety of the community, both here in the United States and abroad. Furthermore, the defendant engaged in these activities for an organization aligned with the Sinaloa Cartel, a drug trafficking organization known for violence and brutality.

Notwithstanding these factors, the defendant argues that the fact that he has contracted the virus that causes COVID-19 no longer makes him dangerous or a flight risk. On the contrary, the defendant should remain detained. Respectfully, the government posits that the weight of these factors has not changed since February 9, 2015, when the Court ordered pre-trial detention, and therefore the defendant remains a danger to the community and/or a flight risk and should remain detained. *See* 18 U.S.C. § 3142(g)(4) (requiring the Court to first evaluate "the danger" that "would be posed by the person's release.")

## II.    While the COVID-19 pandemic is dangerous, it is not a changed circumstance that necessitates reconsideration of bond at this time.

The defendant contracting COVID-19 is not a changed circumstance that warrants reconsideration of this Court's decision to remand the defendant. To be clear, the government does not downplay the risks associated with COVID-19, but simply contracting the disease in and of itself does not trigger automatic release under these circumstances. Rather, the Court is still required to assess the defendant's particularized factors in determining whether to release him. *See United States v. Lee*, 19-cr-298, at *9 (KBJ) (D.D.C. March 30, 2020) ("[T]he relevant statutory

inquiry is *not* the benefits that a defendant's release would bring about (however significant) or the harms that his incarceration would cause (however substantial). Rather, the statute requires the Court to evaluate "*the danger*" that "*would be posed by the person's release*."). Thus, COVID-19 has no material impact on any of the factors that the Court previously considered and there is no additional basis to reopen that detention decision pursuant to 18 U.S.C. § 3142(f). *United States v. Gaskins*, 20-cr-23 (RDM) (D.D.C. April 2, 2020) (noting that the defendant in a firearms case is not particularly vulnerable, and the existence of the pandemic does not eliminate the prior 3142 factors taken into consideration).

If the Court were to consider contracting the virus as a change to the "history and characteristics" of the defendant, the government submits that the information provided thus far does not, as a whole, alter the 3142(g) factors. As defense counsel noted in their motion, the defendant suffered from various medical ailments from the beginning of the case. See Defense Motion at 5. Nevertheless, he was not deemed suitable for release. He now suffers from another health ailment. He has received prompt, continuous medical care inside of a hospital, just as he would if he were released from pre-trial detention. When he is healthy enough, he will be returned to the jail armed with the immunity that scientists believe contacting the virus confers. Stephanie Pappas, *After Recovering from COVID-19, Are You Immune?* Live Science, https://www.livescience.com/covid-19-immunity.html (last visited May 27, 2020). Since the defendant is already receiving medical care at a hospital, and since his return to the jail will be a medical decision made by doctors, there is no reason to release him from pre-trial detention.

When the district court has previously reviewed a motion for release from pretrial detention for health conditions that can be treated at the jail, the court denied the motion, citing that a

defendant's "history and characteristics" is only one of four factors that the Court must consider in determining the appropriateness of pretrial detention. *United States v. Parker*, 517 F. Supp. 2d 375, 377 (D.D.C. 2007) (defendant's medical conditions, including diabetes, asthma and hypertension, for which he required ongoing medication and treatment, *cannot* be dispositive in considering motion for release).[2]

Furthermore, the conditions the defendant proposes for his release—in addition to being impractical and burdensome during the time of the pandemic—do not mitigate the dangerousness posed by this defendant. The defendant's role in this DTO was not one that required his physical presence. Instead, the defendant communicated with other members of the organization, dispatched boats, and coordinated logistics. Given the ubiquity of cellular telephones and other electronic devices with internet capabilities in modern society, and the consequent difficulty of monitoring compliance with a condition banning use of any and all such devices, home confinement would do little to protect other persons or the community from the defendant continuing to traffic narcotics remotely.

Section 3142(i) operates independently of the detention factors. Under 3142(i), the Court could release a defendant temporarily to the custody of another if it finds a "compelling reason" that necessitates temporary release. Respectfully, the defendant obtaining medical treatment in a hospital is not grounds to release him. In fact, it demonstrates that the defendant is obtaining the proper care and that the jail is able to manage the defendant's illness. Moreover, as discussed in greater detail *infra*, the D.C. Department of Corrections (DOC) appears to be have undertaken

---

[2] *See also United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (medical conditions can warrant temporary release under § 3142(i)).

several steps to try to prevent the spread of COVID-19 within its facilities, and thus the defendant contracting COVID-19 will place no extra burden on the facility.

While the government shares the defendant's concerns over the potential risk to the prison population, it remains unclear what, if any, precautions this defendant would be able to put in place to protect himself and those around him from COVID-19 if he were to be released. *See United States v. Edwards*, 20-mj-50, at *6 (RMM) (March 30, 2020 D.D.C.) ("Although [the defendant's] alleged health problems may make him at heightened risk if he contracts the coronavirus, he would be at risk even if he were not incarcerated."); *United States v. Washington*, 18-cr-309 (DLF) (D.D.C. Telephonic Conference April 2, 2020) (noting that an asthmatic defendant who is addicted to narcotics and avoided taking his mental health medication may be safer in custody). If released, he proposes having contact with family members, those responsible for monitoring him, and likely other detainees in immigration custody as the defendant has no lawful immigration status in this country.

Moreover, any such circumstances must also protect the public from a dangerous defendant. While the COVID-19 pandemic is obviously startling, the government still has a duty to ensure the safety of the community and balance the security of others with the safety of the defendant. In other words, unless this or any court is willing to release every defendant who is hospitalized, or every defendant who contracts COVID-19, regardless of their danger and/or risks, the Bail Reform Act still provides the pertinent framework to analyze the defendant's motion.

As this Court is likely aware through prior filings, the government has endeavored – on a case-by-case basis and as a result of the public health crisis currently pending – to permit temporary

release pursuant to 18 U.S.C. § 3142(i) or 18 U.S.C. § 3145(c) to those appropriate individuals who actually need release.[3]

## The D.C. Jail

The United States Attorney's Office for the District of Columbia ("USAO-DC") has informed the Department of Justice's Criminal Division that it has consulted with DOC to obtain relevant information as to its handling of the public health crisis. The undersigned attorneys pass this information along to the Court for its consideration. Indeed, USAO-DC continues consulting with the DOC and coordination with the Department of Justice in light of the rapidly changing situation. Specifically, as of March 27, 2020, DOC has instituted the following protocol to ensure the safety of its incarcerated population:

- banned all non-attorney visits to limit unnecessary exposure;

- implemented screening processes for all visitors and incoming inmates, including attorneys and staff; such screening includes assessing visitors and inmates for symptoms, sanitizing stations, etc.;

- all new inmates are quarantined for 14 days before they assigned to a housing unit;

- if incoming residents at a DOC facility fail the screening process, they are given a mask and taken to medical to determine if they require further hospitalization or testing. Moreover, if there is concern that an inmate has COVID-19, the inmate will be placed into a single cell in a specialized unit, where the inmates only contacts are with medical staff, who will obtain COVID-19 testing within 3-4 days;

- DOC has implemented an incident command program, where each day, DOC units meet to discuss ongoing processes to combat the virus;

---

[3] For example, in *United States v. Carl Courtney*, 19-cr-413 (TJK), the government consented to release where the defendant had open wounds and was scheduled for surgery. In *United States v. Larry Key*, 19-cr-292 (JDB), the government consented to release due to the defendant's advanced age, his lung, heart, and kidney disease, and current multiple hospitalizations. The government is sincerely trying to balance the danger of the offender and the pandemic, but cannot ignore a person's record, their conduct, or their alleged or unverified maladies.

- DOC sends out daily reminders to its staff about taking preventative, prophylactic measures to avoid infection, such as washing hands, using sanitizer, etc.;

- DOC has constant meetings with the D.C. Department of Health to ensure its procedures meet both local and national standards, to include following updated recommendations of the Centers for Disease Control;

- DOC has continued to engage with the USAO and the local Public Defender Service to ensure continuity of operations;

- DOC checks and rechecks its ventilation system to ensure the air quality in the facilities;

- DOC is tracking and ordering additional cleaning and sanitation kits (for example, as of March 17, 2020, the D.C. jail had 55,200 bars of fresh soap, which it dispenses weekly and free of charge to each inmate), as well as protective gear and it has mandated cleaning at its facilities every two hours;

- DOC would like to limit the number of inmates coming into its facility at any given time[4]; and

---

[4] Law enforcement partners have put in place procedures to reduce the number of individuals subject to custodial arrest, exercising their authority to issue citations for individuals to appear on a future dates. *See e.g.*, Metropolitan Police Department Order EO-20-011, *Coronavirus 2019 Modification to Citation Release Criteria* (effective March 17, 2020) ("[T]he USAO and OAG have exercised their authority under DC Code § 23-584(c) to categorically approve the citation release of arrestees consistent with the following updated criteria during the COVID-19 emergency. . ."). Additionally, on March 27, 2020, with the consent of the U.S. Attorney's Office and others, the Chief Judge issued an order regarding the suspension of the execution of bench warrants in certain misdemeanor cases and an order suspending all sentencing provisions requiring service of sentence on weekends. *See also* Superior Court of the District of Columbia Order, March 16, 2020, available at http://www.dccourts.gov/sites/default/files/Order_3-16-20.pdf; COVID-Emergency Act, D.C. Code § 24-221.0(c) (giving DOC discretion to award good time credit); DOC Change Notice #20-002, March 18, 2020 (doubling the maximum number of monthly sentencing credits which a misdemeanant may receive).

Additionally, the inmate populations at CDF and CTF appear to be well below the figures prior to the outbreak of the pandemic. According to a report issued by the Office of the District of Columbia Auditor on Feb. 28, 2019, which was attached as an exhibit to PDS's motion for a Temporary Restraining Order filed in *Banks v. Booth,* Case 1:20-cv-00849-CKK (D.D.C. Mar. 30, 2020), as of June 2018, the average daily populations at CDF and CTF were 1346 and 692, respectively. According to the DOC census distributed to the Criminal Justice Coordinating Council (CJCC), the inmate populations as of February 29, 2020 (prior to the crisis) were 1242 at

14

- upon information and belief, DOC has the capacity to quarantine near 100 inmates, although that number is fluid and subject to change.

*See also* Coronavirus Prevention, D.C. Department of Corrections (March 27, 2020), https://perma.cc/L59Z-WG43 (explaining how DOC has suspended in-person visitations, enhanced cleaning efforts, ordered additional sanitation supplies, and diminished out-of-cell recreational time in response to the threat of COVID-19).

As this Court knows, the D.C. Public Defender Service and the D.C. American Civil Liberties Union sued DOC in the U.S. District Court. That case is stylized as *Banks v. Booth* and is assigned to Judge Colleen Kollar-Kotelly. The plaintiffs allege various failures by the DOC to protect inmates. On April 17, 2020, the government indicated that it would not oppose DOC's motion to join the U.S. Attorney's Office as a defendant. On April 19, 2020, Judge Kollar-Kotelly granted in part and denied in part the plaintiffs' request for injunctive relief (*Banks v. Booth*, 20-cv-849 (CKK), at 1 (D.D.C. Apr. 19, 2020) (hereinafter "Mem. Op.").

The *Banks* opinion supports the government's position that the jail's response to the COVID-19 pandemic does not necessitate the release of detainees at this juncture. The Court rejected the plaintiffs' request for prisoner release and/or the appointment of a downsizing expert

---

CDF and 540 at CTF, and on April 3, 2020 (following three weeks of measures in response to the crisis) were 1097 at CDF and 448 at CTF. In other words, the current jail populations at CDF and CTF are down approximately 18% and 35%, respectively, since the June 2018 average, and down approximately 11% and 17%, respectively, since the end of the month prior to the crisis.

For reference, as of May 15, 2020, there are 973 residents at DOC's Central Detention Facility, and 349 residents at DOC's Correctional Treatment Facility. This represents a *significant* drop in population as DOC attempts to tackle the public health crisis.

(Mem. Op. at 26). Instead, it ordered the further implementation of polices to better address the health and safety of the current inmate population, as recommended by court-appointed *amici* (*id.* at 27-31). Informing its decision <u>not</u> to release any prisoners or even to appoint a downsizing expert were the steps taken by the D.C. Superior Court to reduce the prisoner population and the fact that inmates will continue to be assessed for release on an individualized basis (*id.* at 26–27; *see also supra* n. 3).

The *Banks* opinion anticipates DOC compliance with its mandate. The *Banks* litigation is still at an early stage, as should be clear from the Court's detailed, 31-page memorandum opinion. The Court stated that it expected that "additional development of the record may show that Defendants are taking sufficient precautions and that Defendants' response continues to evolve" (Mem. Op. at 22). In other words, the case continues. The government has every expectation that DOC will comply with the Court order, and in the next few days and weeks, DOC's protocols will be implemented consistent with the Court's mandate.[5] Among the relief the Court ordered was that inmates be "provid[ed] consistent and reliable access to legal calls, personal telephone calls, daily showers, and clean clothing and clean linens to all inmates on isolation status" (Mem. Op. at 29). All parties have an interest in ensuring the safety and security of inmates, regardless of the danger or flight risk they represent, and the *Banks* Court will continue to monitor DOC compliance. Thus, the court-ordered remediation measures should be expected to improve conditions at the jail.

---

[5] As noted by the government's Response to the D.C. Defendants' Motion to Join the United States as a Necessary Party, 20-cv-849 (ECF No. 46), the government does not operate or have authority over the D.C. Central Detention or Correctional Treatment Facility, and thus cannot address or alter inmates' conditions of confinement at those facilities.

The precautionary and sanitation measures ordered by the *Banks* Court (Mem. Op. at 27–31) can be expected to compliment those already undertaken by correctional authorities. On April 1, 2020, DOC provided the *Banks* Court with information including all relevant written procedures and practices concerning COVID-19, particularly related to legal visits and communication. 20-cv-849, ECF No. 19. We have attached the available protocol to this filing (Attachment B – Labeled as "DOC COVID-19 Protocols" originally). In addition, the government respectfully directs the Court to additional documents filed in that active litigation, including: ECF No. 20-1 (Declaration of Lennard Johnson); ECF No. 20-2 (Declaration of Beth Jordan); ECF No. 25 (Defendants' Opposition to Plaintiffs' Application for a Temporary Restraining Order); and ECF No. 25-2 (List of DOC Supplies).

Indeed, while reports of positive cases within the Correctional Treatment Facility (CTF) have increased, such reporting would also seem to support a conclusion that steps are being taken to protect the population currently incarcerated there. Specifically, on March 26, 2020, the government learned that DOC reported its first COVID-19 positive test at CTF to the courts. The inmate was immediately placed into isolation and monitored. DOC and the D.C. Department of Health also began to contact trace, to determine who, if any, had contact with the inmate. DOC has previously handled possible COVID-19 cases with similar procedures.[6] As of May 11, 2020, the government learned that the total number of positive persons is approximately 179 and all have

---

[6] For example, in late March of 2020, a Deputy United States Marshal in D.C. Superior Court tested positive for COVID-19. As a result of this positive test, DOC followed its protocols outlined above. Every inmate who might have been exposed to the deputy was placed in quarantine. Of the quarantined inmates, a single inmate became symptomatic, and later tested negative for COVID-19. The remaining inmates nevertheless remained in quarantine to protect the remainder of DOC's population, until the quarantine was safely lifted.

been placed in quarantine or taken to local hospitals. All inmates are being monitored pursuant to CDC guidelines. Of that group, 141 have recovered, a testament to the fact that, contrary to the plaintiffs' initial allegations in *Banks v. Booth*, it does not appear that DOC is acting indifferently to the needs of its residents. At least one Court has noted that the conditions of the detention facilities are currently the subject of *Banks*, and "the Court has confidence that the D.C. Department of Corrections, which oversees those facilities, will do everything it can to comply with that order so as to prevent the further spread of the virus to its residents and staff." *United States v. Sagastume-Galicia*, 20-cr-40, at *10 (BAH) (D.D.C. April 22, 2020) (ECF No. 10). The Court in fact referred to its own decision in *Banks* in *United States v. Riggins*, 20-cr-10 (CKK) (D.D.C. April 27, 2020), denying release for a mildly asthmatic defendant in a firearms case, noting that the *Banks* Temporary Restraining Order "requires the Department of Corrections to step up its ongoing attempts to implement precautions aimed at stemming the spread of COVID-19 cases within their facilities." *Id.* at *13 ("While the conditions discussed in *Banks* are concerning, so too are the other facets of [the defendant's] relevant history.").

The death of a CTF inmate on April 13, 2020, while tragic, does not change this analysis.[7] As this Court is likely well aware, the possibility of COVID-19 – a global pandemic – reaching DOC was always a realistic possibility, and it was sadly always a possibility that persons could

---

[7] The 51-year-old male inmate had been in custody awaiting trial for homicide since June of 2018. On April 7, 2020, he tested positive for COVID-19. After experiencing respiratory distress, he was transferred to a local hospital and initially deemed stable. Unfortunately, that changed and he succumbed to his illness. While this death is a tragedy, he was monitored in accordance with CDC and D.C. Health guidelines. At this early time, the government is unaware of any issues related to DOC protocol or procedures that affected or could have affected this distressing outcome.

succumb to the virus, both in and out of custody.[8] But DOC is taking steps to contain the effects of this pandemic and complying with D.C. Dept. of Health mandates regarding how to handle positive tests and symptomatic patients. As the government has no authority over DOC, it cannot comment on the particular procedures in place beyond those documented *supra*, but given the ongoing monitoring by the *Banks* Court and the DOC's preexisting efforts, the government has faith that any alleged missteps made by DOC can and will be rectified.

It is undeniable that the government and the Court are faced with the difficult challenge—how to balance the security and safety of the community with the safety of the defendant. But, the DOC has demonstrated in the defendant's case its ability to promptly seek medical attention as needed. Noticeably absent from the defendant's motion is any statement or claim that the defendant has contacted the DOC to determine what other accommodations, if any, may be appropriate for the defendant given the particular health concerns.

The government is committed to ensuring the safety all of inmates, regardless of their detention status. But it is also critical, from the government's perspective, to allow the litigation in *Banks v. Booth* take its course. As noted by Judge Berman Jackson in *United States v. Phillips*, 20-cr-36, at *13 (ABJ) (D.D.C. April 10, 2020), the "stark factual disputes [alleged and contested in *Banks*] will be more appropriately aired and resolved in the context of the civil injunctive action now pending in this court . . . and based on the limited record before it . . . the Court cannot make a finding that the government has failed to act or has been deliberately indifferent that would

---

[8] As of April 12, 2020, the CDC is preliminarily reporting that over 20,000 Americans have passed away due to COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed on April 13, 2020).

completely outweigh the factors set forth in the Bail Reform Act." *Id.*[9] Here, as discussed above, the Bail Reform factors, even taking into consideration the circumstances of COVID-19 and this defendant, remain in favor of detention.

As defendants continue to ask for release based on COVID-19, courts in this district have begun to assess the validity of the various claims related to COVID-19 or DOC. In *United States v. Smith*, 19-cr-324 (BAH) (D.D.C. March 23, 2020), Chief Judge Howell—who also issued Standing Order 20-9, suspending most courthouse operations as a result of the pandemic—remarked that "[t]he risk presented by the pandemic is serious, and the Court acknowledges that risk may be greater in a jail environment . . . ." But the Court also noted that:

> [T]he D.C. Department of Corrections has taken aggressive precautions to prevent the spread of the virus within the facility where defendant is detained . . . including suspending all in-person visits, programming, and volunteer activities within its facilities, enhanced cleaning efforts, especially within common areas, and vigilant medical personnel on alert for symptoms and prepared to isolate and treat symptomatic residents, *see* Department of Corrections Notice, Updated: March 14,

---

[9] In any event, the *Banks* litigation is the better venue to address such complaints. *See, e.g.*, *United States v. Banks*, 422 F. App'x 137, 138 n.1 (3d Cir. 2011) (per curiam) ("We agree with the District Court that a motion filed in his criminal case was not the proper vehicle for raising the claims about prison conditions contained in that motion."); *United States v. Garcia*, 470 F.3d 1001, 1003 (10th Cir. 2006) (noting that, because the defendants' "challenge[s] to the conditions of confinement . . . were raised in motions filed in their respective criminal cases . . . they were properly denied by the district court"). The proper way to raise such a claim is to file a civil suit against the DOC or its warden. *See, e.g.*, *United States v. Folse*, Nos. CR 15-2485 JB, CR 15-3883 JB, 2016 WL 3996386, at *15 (D.N.M. June 15, 2016) ("The general rule is that a defendant must file a separate civil action to address his conditions of confinement."); *United States v. Luong*, No. Cr. 99-433 WBS GGH, 2009 WL 2852111, at *1 (E.D. Cal. Sept. 2, 2009) ("As several courts have recognized, the proper procedure to redress a defendant's grievances regarding treatment within a jail or prison is to file a civil suit against the relevant parties . . . rather than a motion in his criminal case."); *United States v. Wells*, Cr. No. 3:02CR-20-H, 2007 WL 3025082, at *2 (W.D. Ky. Oct. 15, 2007) ("[T]o the extent Wells is challenging his condition of confinement by claiming that his life is in danger, the appropriate course would be to file a civil action against the alleged wrongdoers, not a Rule 60(b) motion in his criminal action."); *Campbell v. McGruder*, 416 F. Supp. 100, 101 (D.D.C. 1975) (addressing "class action brought by unconvicted pre-trial detainees incarcerated at the District of Columbia jail").

> 2020, available at https://doc.dc.gov/page/coronavirus-prevention. Although
> defendant is in an age group that may be more susceptible to the virus . . . this risk
> pertains whether the defendant were released or detained, and any heightened risk
> posed by pretrial detention does not outweigh the presumption in favor of detaining
> the defendant pretrial, nor does it alter the balance of the statutory factors Congress
> prescribed for determining the propriety of detention, which all continue to weigh
> heavily in favor of detention.

*Id.* (denying release in a child exploitation case). Judges have previously noted that DOC appears – despite the obvious struggles of a worldwide health crisis – to be tackling this problem. *See, e.g.*, *Lee*, 19-cr-298, at * 11 (noting the "aggressive precautions that DOC appears to have undertaken to prevent the spread of COVID-19 within its facilities"); *United States v. Adams*, 19-cr-257-003, at *3-4 (DKC) (D. Md March 25, 2020) (COVID-19 is not the "kind of extraordinary reason for Mr. Adams' release. The correctional and medical staff at detention facilities continue to provide appropriate safeguards for health and safety of those committed to their custody."); *United States v. Parker II*, 18-cr-344, at *4, 8 (TDC) (D. Md March 21, 2020) (discussing Deputy U.S. Marshal who tested positive for COVID-19, crediting the defendant's alleged health risks [prior aneurysm, prostate cancer, and present diabetes], and noted that the D.C. Department of Corrections "has implemented prophylactic and other measures in response to the COVID-19 virus."). To the extent circumstances continue to change, the government is committed to informing the court of any known developments related to COVID-19.

The decisions issued by various courts have consistently and clearly illustrated that in assessing the risk (or any particularized risk to a defendant) related to the COVID-19 pandemic, the §3142(g) factors provide the necessary framework to evaluate whether to release an individual who was previously deemed too dangerous or too much of a flight risk to reenter the community. *See, e.g.*, *United States v. Jacob Jordan*, 20-cr-55 (TFH) (D.D.C. March 23, 2020) (acknowledging

the risks associated with COVID but denying release in a guns and drugs case with no prior convictions); *United States v. Gonzalez*, 20-cr-40 (BAH) (D.D.C. March 24, 2020) (denying release, noting the steps taken by DOC to protect inmates); *United States v. Bailey*, 19-cr-391 (JDB) (denying pretrial release, despite defendant's claim of "complicated medical conditions," noting the applicable §3142 factors); *United States v. Park*, 16-cr-9 (TSC) (D.D.C. April 4, 2020) (denying pretrial release in a sex offense case where the defendant failed to rebut the presumption and failed to offer a plan in place if released); *United States v. Rees*, 19-cr-378 (EGS) (D.D.C. April 4, 2020) (denying post-plea release in child exploitation case where the defendant failed to meet his burden and DOC appeared to be reacting reasonably under the circumstances); *United States v. Carter*, 19-cr-39 (RBW) (D.D.C. April 7, 2020) (denying pretrial release in a Hobbs Act robbery case where DOC is trying to take steps to protect inmates and weighing the 3142(g) factors, including the defendant's criminal history and the "very weighty" evidence). *But see United States v. Harris*, 19-cr-356 (RDM) (D.D.C. March 26, 2020) (releasing defendant in a child exploitation case in part because of COVID-19 pandemic, along with the expert opinion signifying the defendant's limited danger); *United States v. Jaffee*, 19-cr-88 (RDM) (D.D.C. March 26, 2020) (releasing defendant because of COVID-19 pandemic but noting his prior perfect compliance with his conditions of release as well as weakened state evidence in a gun and drugs case); *United States v. Mclean*, 19-cr-380 (RDM) (D.D.C. March 28, 2020) (releasing the defendant in a gun and drugs case due to COVID-19, the defendant's prior HISP release orders, and the underlying condition for diabetes); *United States v. Kofi Appiah and James Hutchings Jr.*, 19-cr-361 (BAH) (D.D.C. March 26, 2020) (releasing defendants in a firearms conspiracy case because of underlying health conditions, including severe assault at jail and verified asthma). A close reading of each case

suggests that the particulars of the defendant's circumstances guide the analysis. COVID-19, alone, is not a talismanic but-for cause of the defendant's release, even under 18 U.S.C. § 3142(i).[10]

Opinions filed in neighboring districts are in accord.[11] Early in this crisis, on March 17, 2020, Judge Paul Grimm of the U.S. District Court, Maryland, issued a written memorandum opinion on COVID-19. *See United States v. Martin*, 2020 WL 1274857, *2 (D. Md. March 17, 2020). Noting, appropriately, that the Court "takes this [COVID-19] health risk extremely seriously," the Court nevertheless recognized that "resolving . . . an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act." *Id.* at *3. In addressing the new issue raised by the defendant – COVID-19 – the Court nevertheless found that the defendant's health (his asthma, high blood pressure, and diabetes) was "insufficient to rebut the proffer by the Government that the correctional and medical staff at [the local detention facility] are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus." *Id.* at *4. Finally, the Court questioned the defendant's

---

[10] *See also United States v. Cox*, No. 19-cr-271, 2020 WL 1491180 (D. Nev. Mar. 27, 2020); *United States v. Green*, No. 19-cr-304, 2020 WL 1477679 (M.D. Fla. Mar. 26, 2020); *United States v. Steward*, No. 20-cr-52, 2020 WL 1468005 (S.D.N.Y. Mar. 26, 2020); *United States v. Hamilton*, No. 19-cr-54, 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020).

[11] *But see United States v. Stephens*, 15-cr-95-AJN (S.D.N.Y. March 19, 2020) (COVID-19 outbreak and as well as a change in the facts of the case – a possible misidentification by an eyewitness – necessitated release). In choosing to release the defendant, the Court noted the defendant's lack of a violent record, the weakened state of the government's evidence, the failure of the local jail to arrange legal calls in preparation of his defense, and the effective ban on legal visits with limited exceptions as bases to implement release conditions. *Id.*

Notably, the Court recognized that its decision cannot be made simply because of COVID-19. *See id.* at *6 n.3 ("The Court need not decide this additional factor [the current public health crisis] here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i).")

proposed use of GPS location monitoring even if the defendant was released subject to conditions, finding that such monitoring "is not a limitless resource, nor its installation and monitoring by United States Pretrial Services officers without risk to those personnel . . . given the current recommendations regarding implementation of social distancing." *Id.*; *see also United States v. Lewis*, 19-cr-34-LMA-MBN (E.D. La. March 19, 2020) ("If anything, the COVID-19 pandemic has reduced the availability of conditions to mitigate the risk to the community"). The Court's concerns in *Martin* continue to remain relevant, even as the crisis worsens. Like the U.S. District Court for the District of Columbia, judges in the District of Maryland (Greenbelt Division) – whose defendants are also detained by DOC – has also denied release on generalized grounds, noting the importance in evaluating the defendant's risk through the Bail Reform Act. *See, e.g.*, *United States v. Bilbrough, IV*, 20-cr-33, at *4-5, 7 (TDC) (D. Md March 20, 2020) ("D.C. Department of Corrections appears to be taking reasonable steps to prevent and combat the spread of COVID-19 in its facilities. Although [the defendant] may still be at an increased health risk [from diabetes] . . . this factor alone does not outweigh the other factors."); *United States v. Brown*, 16-cr-553 (RDB) (D. Md March 26, 2020) (denial of release from BOP custody); *United States v. Jefferson*, 19-cr-487 (CCB) (D. Md March 23, 2020) ("Precautionary measures have been implemented at CTF in light of the COVID-19 pandemic" denying release to an asthmatic defendant); *United States v. Johnson*, 17-po-9262 (TMD) (D. Md March 20, 2020) (discussing general risk of exposure to COVID-19, but denial of release on other grounds); *United States v. Jones*, 17-cr-582, at *2 (CCB) (D. Md March 20, 2020) ("CDF medical personnel are adequately addressing Defendant's medical needs" and the COVID-19 "risks are not the sole determinant of whether detention is appropriate."); *United States v. Legard*, 19-cr-137, at *2-3 (PWG) (D. Md March 24, 2020)

(Asthma was not a basis alone to release a defendant in light of COVID-19 pandemic and that the measures at the D.C. jail are "in compliance with state and federal guidelines regarding protective measures"); *United States v. Perry*, 14-cr-181, at *1-2 (GLR) (D. Md March 26, 2020) (denial of release from halfway house due to COVID-19, but on statutory reasons, but also noting that the affidavit of Dr. Marc Stern "lack[ed] the case or institution specificity to determine, with sufficient certainty, the health risks posed at the institution."). In fact, in *United States v. Williams*, 13-cr-544 (PWG) (D. Md March 23, 2020), the Court even acknowledged that DOC has taken significant measures to stem the tide of the pandemic, but that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly." *Id.* at *5. Perhaps most explicitly, "[t]he existence of the present pandemic, without more, is not tantamount to a "get out of jail free" card. Not even for the older person being detained." *Id.* The Court thus denied a 67-year-old defendant emergency release.

In this case, the defendant has already contracted the virus, and DOC has ensured that he received proper care. He is currently receiving inpatient treatment in a local hospital, and the decision to release him back to the jail is a medical one made by the doctors at the facility. DOC has thus demonstrated an ability to manage the defendant's illness. In light of his dangerousness and the substantial likelihood of flight given his dearth of contacts in the United States, pre-trial detention remains appropriate.

Finally, while the COVID-19 virus is new, arguments based primarily on health concerns are not. Courts have generally recognized that "it is a rare case in which health conditions present

an exceptional reason" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (quotations omitted). As noted by the government as it continues to assess vulnerable defendants on a case-by-case basis for temporary release, the Bureau of Prisons (BOP) is similarly assessing its low-risk, non-violent offenders for release, but through meaningful scrutiny.[12]

The government appreciates the gravity of this global pandemic and is committed to ensuring the safety and health of inmates like the defendant. But at this stage and at this time, based on the information provided by DOC, DOC appears dedicated and willing to address this public health crisis. Whether the Court analyzes this case under the "compelling reason" language of 18 U.S.C. § 3142(i) or the "exceptional reason" standard of 18 U.S.C. § 3145(c), the defendant cannot demonstrate that his release benefits the community. Moreover, the existence of the COVID-19 pandemic can certainly factor into this analysis, but it cannot be dispositive, without

---

[12] *See* The U.S. Attorney General's March 26, 2020 memorandum related to the "Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic." As described by BOP, "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *Id.* As part of the analysis in assessing whether inmates should be granted home confinement, BOP was encouraged to look at, among other factors, the "age and vulnerability" of the inmate; the inmate's criminal history; whether the inmate has "demonstrated a verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions . . . upon release would present a lower risk of contracting COVID-19 than . . . in his or her BOP facility"; and the assessment of the danger posed by the inmate to the community. *Id.* The government's filing does just that. Notably, the March 26, 2020 memorandum also counsels that "before granting any inmate discretionary release, the BOP *Medical Director* . . . will, based on CDC guidance, make an assessment of the inmate's risk factors for *severe* COVID-19 illness*, risks of COVID-19 at the . . . facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement." *Id.* (Emphasis Added). The defendant's request generally summarizes the risk of COVID-19, but in no way establishes the high bar described above, and how his placement in the community would benefit both him *and* the community.

more. Thousands upon thousands of Americans will be affected by this crisis, both inside and outside of detention facilities. The inquiry before this Court, today, is whether the Court can trust the defendant's safe return to Court regardless. Respectfully, that answer is no.

## CONCLUSION

Given the plans in place at the DOC, the defendant's prompt receipt of medical care, his risk of flight owing to minimal contacts in the U.S. and substantial foreign wealth and connections, and the danger that the defendant represents to the community – the same community also affected by this illness, the government respectfully requests that this Court deny the motion.

Respectfully submitted,

MARLON COBAR, Acting Chief
Narcotic and Dangerous Drug Section
United States Department of Justice
Criminal Division

By:     /Ss/

Anthony T. Aminoff
Kirk Handrich
Trial Attorneys
Narcotic and Dangerous Drug Section
United States Department of Justice
145 N Street, NE, East Wing, Second Floor
Washington, D.C. 20530
Phone: (202) 616-2379

Dated: May 29, 2020